UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
ADELA PAGAN in her own right
and as Administrator of the ESTATE OF
MARIO OCASIO, deceased,

                  Plaintiff,                      AMENDED COMPLAINT

            -against-                  Civ. Action No.:
                                        1:15-cv-5825 (LDH) (RLM)

THE CITY OF NEW YORK,
LIEUTENANT LUIS HERNANDEZ, Shield # 04144,
SERGEANT WAIMING PUN, Shield # 13083,
OFFICER PAUL CHO, Shield # 04631,
OFFICER PATRICK COYLE, Shield # 24934,
OFFICER YULITZA BALBI, Shield # 11013,
OFFICER HIRAM MONTALVO, Shield # 28679,
each sued individually.

                                     DEMAND FOR JURY TRIAL

                Defendants.
-------------------------------------------------------------------x

## INTRODUCTION

1.  This action arises from the unjustified killing of Mr. Mario J. Ocasio ("Mario") by New York City police officers and medical technicians, and the conspiracy of the Defendants to cover it up.

2.  On June 8th 2015, Mario, an unarmed fifty-one (51) year-old man, was killed in his own home by NYPD officers and EMS technicians summoned by his girlfriend, Ms. Geneice Lloyd, to transport him to the hospital for psychiatric evaluation and care.

3.  Despite prior knowledge of Mario being in an emotionally disturbed state, Defendants attempted to subdue him with excessive and lethal force.

4.  As Mario lay on the floor staring out the window he chanted, "I SEE GOD!!", yet at least 6 officers brutally beat, bludgeoned, maced, and electrocuted him to death.

5.  Defendants failed to properly provide CPR when Mario went into cardiac arrest and further complicated matters by spreading lies and rumors to the media while refusing to properly declare to the family the details of the incident which caused, and continues to cause, Ms. Adela Pagan emotional distress.

6. Defendants, acted with deliberate indifference, and were otherwise careless and negligent in their failure to properly subdue Mario, administer any adequate medical aid prior to, during or after placing Mario in handcuffs, and then misinforming EMS that he was on heroin, which then further prevented claimant's decedent from obtaining proper emergency medical treatment.

7. Plaintiffs seek redress against (*a*) the unconstitutional and tortuous conduct of the NYPD officers that fatally injured Mario and denied him timely emergency care; (*b*) those conspiring with those officers, for their reckless and intentionally false statements aimed at depriving Mario of his civil and other rights; and (*c*) the City of New York, for their deliberate indifference to customs, policies, and practices that perpetuated an environment lacking in adequate training and supervision of NYPD personnel and which ultimately resulted in Mario's death.

## JURISDICTION AND VENUE

8. This action is brought pursuant to 42 U.S.C. Sections 1983 and 1988, the Fourth and Fourteenth Amendments to the United States Constitution and the laws of the State of New York.

9. Jurisdiction is founded upon 28 U.S.C. Sections 1331, 1343 and 2202. Plaintiff further invokes the supplemental jurisdiction of this Court to adjudicate pendant state law claims pursuant to 28 U.S.C. § 1367.

10. Venue is proper in this district under 28 U.S.C. § 1391.

## PARTIES

11. At the time of his death Mario J. Ocasio ("Mario") resided at 2263 Loring Place in the Bronx, New York. Mario was beloved as a genuine and friendly person. According to his family, he loved to make people laugh and, "would give his last dollar to anyone who asked." He was dearly loved by all who knew him including his family, his neighborhood, at work and in Church. Although Mario did have a criminal past from his youth, upon information and belief in the thirty-five years since his youth he has had no known criminal issues with the law.

12. Plaintiff Ms. Adela Pagan ("Plaintiff" or "Ms. Pagan"), the mother of Mario and the Court appointed administrator of his Estate, is and has been at all relevant times a resident of the Bronx, New York. Ms. Pagan seeks relief in her individual and her representative capacity.

13. Defendant the City of New York (the "City") is a municipal corporation, existing and operating by virtue of the laws of the State of New York.

2

14.     Defendants Paul Cho, Shield # 04631, Patrick Coyle, Shield # 24934, Yulitza Balbi, Shield # 11013, Hiram Montalvo, Shield # 28679, John Doe 1, John Doe 2, John Doe 3, John Doe 4, John Doe 5, and John Doe 6 (together, the "Police Officers") were each, at all relevant times, NYPD Police Officers and employees and agents of the City and of the NYPD.

15.     Defendants Lieutenant Luis Hernandez, Shield # 04144, Sergeant Waiming Pun, Shield # 13083, Richard Roe 1, Richard Roe 2, Richard Roe 3, Richard Roe 4, Richard Roe 5 and Richard Roe 6 (together, the "Supervisory Officers") were each, at all relevant times, Supervisory Officers employed by NYPD with direct or indirect oversight responsibility for one or more of the Police Officer Defendants, and employees and agents of the City. Supervisory Officers were each responsible for screening, hiring, training, instruction, supervising, disciplining and/or policy-making with respect to one or more of the Police Officer Defendants and/or one or more of the Supervisory Officer Defendants.

16.     Defendant Douglas Guzman, Pablo Quinoe, Patrick Worms and Bree Brown-Rosa (together, the "Medical Technicians") were each, at all relevant times, EMS Medical Technicians and employees and agents of the City and of EMS.

17.     With respect to acts and omissions set forth in this complaint, the Police Officer Defendants, Supervisory Officer Defendants (together, the "NYPD Defendants") and the Medical Technician Defendants were each acting under color of state law and in the course and scope of his/her duties and functions as an agent, servant, employee and/or officer of the City, and/or was engaged in conduct incidental to the performance of those functions.

## PRELIMINARY BACKGROUND

18.     On June 17th, 2015, Plaintiff filed a timely notice of claim against the City in compliance with New York General Municipal Law §50-e.

19.     On July 14th, 2015, Plaintiff received notice from the New York City Law Department of a scheduled hearing to be held on September 30th, 2015 under New York General Municipal Law §50-h.

20.     On September 30th, 2015 Plaintiff Adela Pagan attended the City's 50-h hearing.

21.     Plaintiff has complied with all conditions necessary to bring this lawsuit.

22.     On January 7th, 2016 by the decree of the Bronx County Surrogate's Court, Plaintiff was appointed administrator of the estate of Mario Ocasio.

## FACTUAL BACKGROUND

A. <u>The Events Leading to Mario Ocasio's Death</u>

23.     Around 7:00am on June 8th, 2015 Mr. Mario Ocasio, his girlfriend Ms. Geneice Lloyd ("Ms. Lloyd") and Ms. Lloyd's eight month old grandnephew went outside for a walk and to get cigarettes. Outside, Ms. Lloyd observed Mario meet one of his friends. However, Ms. Lloyd did not interact with this friend. They then returned to the apartment, where Ms. Lloyd's nephew, Mr. Kashif Osagie ("Mr. Osagie") was asleep. Mario began to cut the filtered butts off of a cigarette, re-rolled it and then began to smoke.

24.     Soon thereafter, Ms. Lloyd began to smell something strange and so she approached Mario and he jumped up and screamed, "I'm God!!!" and began to act in a strange manner without regard for his surroundings. Ms. Lloyd then called for Emergency Medical Services.

25.     Ms. Lloyd was concerned by the episode because Mario had never before manifested such behavior**.** She ran into the bedroom and woke up her nephew, Mr. Osagie.

26.     Ms. Lloyd then called the 911 from her cell phone at approximately 8:13am and requested an ambulance to transport Mario to a hospital. Although Ms. Lloyd did not request police involvement, NYPD central dispatch operator ("Central") dispatched police officers to Mario's home.

27.     Via radio broadcast, Central advised the officers responding to the assignment that the job involved "Mentally Ill or Emotionally Disturbed Persons" (known among New York City personnel as "EDPs").

28.     More than ten uniformed NYPD Officers and four EMS Medical Technicians arrived on the scene.

29.     All of the NYPD Defendants had knowledge that Mario was an EDP, but all of them treated him as though he was a criminal and attempted to arrest him.

30.     Mario died of cardiac arrest in Defendants' custody as a result of Defendants' conduct.

B. <u>NYPD's Ostensible Procedures Governing Officers' Interaction with Persons with Mental Illness</u>

31.     NYPD has prepared a number of written policies, protocols, guidelines and

training materials, ostensibly for the purpose of training, guiding and supervising interaction between NYPD personnel and emotionally disturbed people.

32.     NYPD Patrol Guide Section 216-05 sets forth NYPD protocol concerning interactions with "Mentally Ill or Emotionally Disturbed Persons".

33.     The stated purpose of Section 216-05 is to "safeguard a mentally ill or emotionally disturbed person who does not voluntarily seek medical assistance."

34.     The "Scope" of Section 216-05 states:  "If an EDP is not immediately dangerous, the person should be contained until assistance arrives. . . . When there is time to negotiate, all the time necessary to ensure the safety of all individuals will be used."

35.     Section 216-05, subsection 1(c) further directs that "if EDP's actions do not constitute an immediate threat of serious physical injury or death to [him]self or others: (1) attempt to isolate and contain the EDP while maintaining a zone of safety [a distance which is dependent upon the particular circumstance but which is generally considered to be distance of twenty (20) feet from the person] until arrival of patrol supervisor and Emergency Service Unit personnel.  (2) ***Do not attempt to take the EDP into custody without the specific direction of a supervisor.***" (emphasis added).

36.     Section 216-05, subsection 2(a) provides that, in the event an EDP is unwilling to voluntarily seek medical assistance, an officer is required to "[a]scertain if [a] patrol supervisor is responding, and, if not, request [a] response."  Subsection 2(a) further provides: "NOTE: Communications Section will automatically direct the patrol supervisor and Emergency Service Unit to respond to scene in such cases."

37.     Further, NYPD Patrol Guide Section 203-11, entitled "Use of Force," states: "Only that amount of force necessary to overcome resistance will be used to effect an arrest or take a mentally ill or emotionally disturbed person into custody."

38.     Section 203-11 also cautions:  "Whenever possible, members should make every effort to avoid tactics, such as sitting or standing on a subject's chest, which may result in chest compression, thereby reducing the subject's ability to breathe."

39.     Section 203-11 further directs: "After an individual has been controlled and placed under custodial restraint using handcuffs and other authorized methods, the person should be positioned so as to promote free breathing. The subject should not be maintained or transported in a face down position."

40.      NYPD has prepared training materials that elaborate upon these sections of the Patrol Guide.  In one of them, a chapter contained in training materials distributed to students at the NYPD Police Academy entitled "Police Student's Guide: Policing the Emotionally Disturbed" (New York Police Department, 2009), NYPD specifically advises that:

- EDP's should be treated with patience and understanding.  They should not be forcibly handled unless it is clear there is no other way to meet your responsibility to protect life."

- "Never use force or threat of force against an EDP unless there is no other way to protect life against imminent danger."

- "Officers should take as much time as necessary to take EDP's into custody.  These are not situations to be rushed.  Specially trained and equipped Emergency Service Unit ("ESU") officers will be automatically dispatched to respond to assignments involving EDP's . . . ."

- "Officers should take great care to assure that they do not restrain or confine EDP's in ways that may hurt – or even kill – them. **NEVER CONFINE EDP's – OR ANYBODY ELSE – IN FACEDOWN, PRONE POSITIONS FOR LONGER THAN IT TAKES TO HANDCUFF THEM."** (emphasis in original)

- "Do not challenge an EDP's perceptions.  These may be hallucinations or delusions, but they are real to [him]."

- "Do not act in a confrontational manner by arguing with or challenging the EDP."

- "Take as much time as you need to avoid injury to anybody: in these situations, time works to your advantage.  Don't lose this advantage by rushing or forcing a confrontation."

- "In any case, when there is time to negotiate, take all the time necessary to insure the safety to all individuals concerned.  Await the arrival of the supervisor and the [ESU] whenever no immediate action to prevent injury or death is required."

C. NYPD's Custom and Practice of Failing to Supervise and Train Officers
With Respect to Interaction with the Emotional Disturbed

41.      Despite NYPD's preparation of written policies, protocols, guidelines and training materials with respect to interactions with persons with mental illness, NYPD has a custom and practice of failing to adequately supervise and train officers with respect to such interactions that are so persistent and widespread as to carry the force of law.

42.      This failure has taken place, despite the fact that Commissioner Bratton and the Supervisory Officers who have authority to set NYPD policy with respect to interactions between NYPD personnel and so-called EDPs, know: (**a**) to a moral certainty that such interactions

6

would frequently and routinely occur; (*b*) that such interactions present the NYPD personnel with difficult choices and/or have been too often mishandled; and (*c*) that the mishandling of such interactions would frequently result in the deprivation of civil rights.

43.　　　Mental health professionals and advocates have long called upon NYPD to institute minimally adequate supervision and training of NYPD personnel with respect to interactions with the mentally ill, using generally-accepted best practices endorsed by law enforcement officials throughout the United States.  NYPD has refused to do so.

44.　　　In 2008, NYPD formed a "Link Committee" composed of certain mental health professionals and advocates and several of the unnamed Richard Roes 1 - 6, ostensibly for the purpose of, among other things, ensuring minimally adequate NYPD supervision and training with respect to NYPD interactions with persons with mental illness.

45.　　　Upon information and belief, those Richard Roes 1 - 6 who served on the Link Committee were instructed by their superiors against, and had no intention of, ensuring minimally adequate NYPD supervisory and training policy with respect to police interactions with persons with the mentally ill.

46.　　　The LINK Committee was eventually disbanded, without issuing any report or recommendations with respect to NYPD interactions with persons with mental illness.

### D. The Officers' Disregard for Procedures in Confronting Mario Ocasio

47.　　　Two of the Police Officer Defendants dispatched by Central in response to Ms. Lloyd's ambulance request arrived at Mario's home.  At that time, no supervisors or ESUs had arrived.

48.　　　The officers found Mario, a fifty-one (51) year-old Latino-American man, on the ground in the living room. Mario was unarmed and carried no objects, and he remained so throughout his encounter with the officers.

49.　　　The two officers gathered around Mario and explained to him that he needed to give them his hands so that they could place him under arrest.

50.　　　Mario was confused.  He did not grasp that these strangers in his home were police officers.  He refused to give them his hands or put his hands behind his back, and continued to chant, "I am God! I am God!!!"

51.　　　One of the Police Officer Defendants, officer Paul Cho, attempted to reason

with Mario by speaking calmly.

52.     However, upon information and belief, the other Defendant officer, a bald man, challenged Mario, insisting he comply and then, almost immediately thereafter, took out his baton and began to viciously beat Mario about his shins.

53.     This officer did so, despite the admonition in NYPD training materials "not [to] act in a confrontational manner by arguing with or challenging the EDP."

54.     The officer knew, or should have known, that confronting and antagonizing Mario in this manner would decrease the likelihood that he would voluntarily seek medical treatment.

55.     Upon information and belief, the officer confronted Mario in this manner because, among other reasons, he had not been adequately trained, monitored, guided or supervised by Commissioner Bratton and/or the Supervisory Officer Defendants with respect to interactions with persons with mental illness.

56.     While being viciously beaten Mario screamed, "I am God! I am God!!", but he did not take any action to threaten or endanger other, the officers or himself.

57.     The officers failed to recognize Mario's delusional statements for what they were, and instead mistook them as a challenge to their authority.  The officers made this mistake because they had not been adequately trained, monitored, guided or supervised by NYPD and/or by the Supervisory Officer Defendants with respect to interactions with persons who are emotionally disturbed.

58.     Upon information and belief, the officers felt challenged in their authority and both began to viciously beat Mario in a premature, misguided, and otherwise unreasonable attempt to get him to put his hands behind his back after less than two minutes of speaking with him.

59.     The officers rushed their encounter with Mario in this manner, despite the directive in the NYPD Patrol Guide that "When there is time to negotiate, all the time necessary to ensure the safety of all individuals will be used," and the urging of the NYPD training materials that "Officers should take as much time as necessary to take EDP's into custody.  These are not situations to be rushed."

60.     About five minutes after their arrival at Mario's home, one of the two initial officers at the scene called Central for backup.

8

61.     The officer called for backup instead of response by an ESU, despite NYPD procedures calling for ESU involvement in cases where an EDP refuses to voluntarily accept transport for medical attention.

62.     The officer called for backup instead of an ESU because, among other reasons, he had not been adequately trained, monitored, guided or supervised by Commissioner Bratton and/or the Supervisory Officer Defendants with respect to interactions with persons with mental illness or the emotionally disturbed.

E. The Officers' Unsupervised Restraint of Mario Ocasio

63.     The officers knew, or should have known, that their actions would exacerbate Mario's confusion and fear, and increase the likelihood of a violent confrontation.

64.     The officers' actions in beating Mario in his own home caused him extreme emotional distress and mental anguish.

65.     Mario pulled against the officers holding his arms, screaming, "I'm God!, I'm God!!" The officers would not let him go.  While holding Mario's arms, the officers then jumped on top of him and began to wrestle his arms behind him.

66.     The officers forcefully restrained Mario, despite NYPD procedures prohibiting the use of force against an EDP except in cases of immediate danger, and prohibiting the taking into custody of an EDP absent the presence and/or supervision of a supervisor and/or ESU personnel.

67.     The officers knew, or should have known, that beating, grabbing and tackling Mario would further exacerbate his confusion, fear and emotional distress.

68.     The officers' brutal attack on Mario in his own home was without cause or justification, and undertaken intentionally, recklessly, wantonly and with gross negligence.

69.     The officers' actions attacking Mario caused him personal injury, pain and suffering, extreme emotional distress, and mental anguish.

70.     Upon information and belief, the officers attacked and beat Mario in his own home because, among other reasons, (*a*) they had not been adequately trained, monitored, guided or supervised by Commissioner Bratton and/or the Supervisory Officer Defendants with respect to interactions with persons with mental illness; and (*b*) it is the policy, custom and practice of the NYPD to allow, preserve and condone among NYPD officers an environment of disregard for the

rights and safety of the emotionally disturbed.

F.  The Officers' Beating, Tasing and Asphyxiation of Mario Ocasio

71.     More than four officers joined the two initial responding police officers in Mario's home.

72.     A lieutenant wearing a white shirt and a gold badge named Luis Hernandez entered Mario's home minutes after the last group of police officers.

73.     By failing to respond promptly to Mario's home when he was first requested to do so, the lieutenant failed to follow the NYPD Patrol Guide protocol requiring the presence of a supervisor on an ambulance call involving an EDP who refuses to voluntarily seek medical treatment.

74.     Upon information and belief, the lieutenant delayed his response to Mario's home because, among other reasons, he had not been adequately trained, monitored, guided or supervised by Commissioner Bratton and/or the Supervisory Officer Defendants with respect to interactions with emotionally disturbed people.

75.     When the lieutenant belatedly entered the home five or more officers were already restraining Mario by beating him with batons, punching him, kicking him, macing him and stomping on his face. The officers were all on top of him and rested their combined weight on Mario as they handcuffed his hands behind his back. This struggle ensued for several minutes.

76.     The officers did so, despite the NYPD protocol requiring that "[w]henever possible, [officers] should make every effort to avoid tactics, such as sitting or standing on a subject's chest, which may result in chest compression, thereby reducing the subject's ability to breathe."

77.     During the struggle, Ms. Lloyd used her nephew's cell phone to record video of the entire incident.

78.     Not long after Ms. Lloyd began recording, Mario was handcuffed however he was still in an emotionally disturbed state.

79.     The lieutenant used a Taser conducted energy weapon to administer electric current and shock Mario into compliance. He did this not once, but twice.

80.     The electric current administered to Mario caused him extreme pain and suffering, and mental anguish before he died.

81.     The lieutenant intentionally administered the electrical current, and did so in a reckless, negligent, and otherwise improper manner, contributing to Mario's pain, suffering, and death.

82.     The NYPD Defendants continued in this manner, resting their combined weight on Mario, cursing him, and apparently beating and shocking him, until he went still.

83.     When the officers were done, Ms. Lloyd and Mr. Osagie never saw Mario move again.

84.     The officers' actions in beating, asphyxiating, macing and shocking Mario were without cause or justification, and were undertaken intentionally, maliciously, recklessly, wantonly and/or with gross negligence.

85.     The officers' actions in beating, asphyxiating, macing and shocking Mario were without legal authority in violation of him constitutional rights, including his right to be secure in his person and free from the use of unreasonable force, in his own home no less.  These acts are shocking to the conscience.

86.     The officers' actions in beating, asphyxiating, and shocking Mario caused him to suffer extreme pain and suffering, emotional distress and mental anguish, and contributed to his respiratory and cardiac arrest which ultimately caused him to die that fateful morning.

87.     Upon information and belief, the officers beat, asphyxiated, maced and shocked Mario because, among other reasons, (**a**) they had not been adequately trained, monitored, guided or supervised by Commissioner Bratton and/or the Supervisory Officer Defendants with respect to interactions with persons with mental illness; and (**b**) it is the policy, custom and practice of the NYPD to allow, preserve and condone among NYPD Defendants an environment of disregard for the rights and safety of persons with mental illness, or the emotionally disturbed.

88.     Mario died as a result of the electric shock, and the NYPD Defendants were aware of his death because the metal prongs from the lieutenant's device were never removed from Mario's body and were still visible when his family identified his body.

89.     Upon information and belief Mario, the EMTs or the NYPD Defendants would have removed the prongs if he was alive and being treated.

G. The EMTs' Delay of Emergency Life Support to Mario Ocasio

90.     Upon information and belief, the officers continued to apply weight and force

on Mario for several minutes after he stopped moving.

91.     Soon after the second swell of officers, four EMS Emergency Medical Technicians ("EMTs") arrived in two sets of two at Mario's home. At the time of their arrival, Mario was already restrained.

92.     The first set of EMTs witnessed Mario receive the electric shock, but did not perform CPR, or any resuscitative measures. The second set arrived shortly thereafter.

93.     The police officers on the scene instructed the EMTs that Mario was on heroin and needed a drug to counteract the effects.

94.     The EMTs obeyed the officers' instruction and also decided to give Mario a sedative, with out first conducting a review of his condition.

95.     As Mario lay motionless, one of the EMTs, an African-American woman named Ms. Bree Brown-Rosa, gave Mario a long needle with Narcan to counter act heroin, and Midazolam to sedate him, while another slowly obtained a gurney from the ambulance.

96.     Midazolam is the same drug used in lethal injection procedures to administer the death penalty.

97.     The EMTs and police officers then wrapped Mario in a white blanket, to hide his bruises, and placed him sideways on a gurney while he was handcuffed.

98.     The officers' failure to promptly cease applying weight and force to Mario's body after he had been subdued, and/or their failure to promptly summon the EMTs after he became unconscious, caused and/or contributed to his respiratory and/or cardiac arrest, materially diminishing him chances of survival.

99.     The officers failed to promptly cease applying weight and force to Mario's body after he had been subdued, and/or failed to promptly summon the EMTs after he became unconscious, because, among other reasons, (*a*) they had not been adequately trained by the Commissioner Bratton nor adequately supervised by their supervisors with respect to the use of force; and (*b*) it is the policy, custom and practice of NYPD to allow, preserve and condone an environment among NYPD officers of disregard for the rights and safety of persons with mental illness, or emotional disturbance.

100.    Two EMTs and two police officers carried Mario's body down the very narrow apartment staircase. They did not check Mario's pulse, and they never performed

resuscitative measures.

101.    According to EMT reports, when they transferred Mario into the ambulance, one of these EMTs declared that Mario had "no pulse," confirming Ms. Lloyd's, Mr. Osagies's and the cell phone video footage account of how Mario's body went lifeless.

102.    One of the officers then removed the handcuffs from Mario and then, for the first time, EMTs attempted to resuscitate Mario in the ambulance. Ms. Lloyd rode in the ambulance with Mario's lifeless body.

103.    At no time did any of the officers make any attempt to provide emergency care to Mario.

104.    According to the records of the EMTs, Mario never again regained consciousness or resumed breathing.

105.    Upon information and belief, the delay in providing Advanced Life Support ("ALS") Services to Mario materially reduced his chances of survival and/or was a contributing cause of his death.

106.    The EMT Defendants caused the delay of ALS Services at Mario's home, with the purpose and intent of concealing the role of the NYPD Defendants in killing Mario, and/or with deliberate indifference to whether he lived or died. The EMT were otherwise negligent in the performances of their duties.

107.    The EMTs spent approximately 20 minutes at Mario's home and never attempted to resuscitate him before bringing him to the hospital. During the trip, they did not have their sirens on, and they stopped at red lights during the drive to the hospital.

108.    Upon information and belief, the delay in bringing Mario to the hospital was a final, contributing cause of his death.

109.    Upon information and belief, EMT Defendants caused the delay of the transport of Mario to the hospital, with the purpose and intent of concealing the role of the NYPD Defendants in killing Mario, and/or with deliberate indifference to whether he lived or died. They were otherwise negligent.

110.    Mario arrived at The Allen Hospital/New York Presbyterian at 9:40am, more than an hour after Ms. Lloyd's call seeking medical help.

111.    Upon arrival at the hospital, Mario was not breathing, had no heart rate, and

13

his pupils were dilated and fixed.

112.     At 9:40 a.m. on June 8th, 2015, Mario was pronounced dead.

113.     Upon their arrival at the Hospital, Ms. Pagan, Mario's mother was told by hospital personnel that Mario was dead, and that Mario had gone into cardiac arrest approximately 30 minutes prior to his arrival at the hospital.

114.     The EMT Defendants caused a delay in the provision of advanced life support services and hospital services to Mario because, among other reasons, (*a*) they had not been adequately trained by the Commissioner Nigro; and (*b*) it is the policy, custom and practice of EMS to allow, preserve and condone the NYPD's disregard for the rights and safety of persons with mental illness, or emotional disturbance.

115.     The actions and omissions of the EMT Defendants that caused delay in the delivery of appropriate emergency medical care to Mario were without cause or justification, and were undertaken intentionally, maliciously, recklessly, wantonly and/or with gross negligence and/or negligence.

116.     The actions and omissions of the EMT Defendants that caused delay in the delivery of appropriate emergency medical care to Mario were without legal authority in violation of him constitutional rights, and are shocking to the conscience.

117.     As a consequence of his death, Mario was deprived of the pleasures and enjoyment of life, liberty, and the pursuit of happiness.

118.     As a consequence of the death of Mario, Ms. Adela Pagan was denied the love, society, companionship, intimate family relationship and pecuniary support of her beloved son Mario.

H. Illegally Confiscated Cell Phone Video and Eye Witness Statements

119.     Three eye witnesses were interviewed by the Civilian Complaint Review Board.  Mr. George Cantrell, Mr. Kashif Osagie and Ms. Geneice Lloyd were all questioned separately and all explained that Mario was brutally beaten and killed after he was subdued by more than seven officers.

120.     According to them, the Police Officer Defendants brutally beat, maced, kicked and dug their boots into Mario's face while he was handcuffed before he died.

121.     Mr. Osagie also identified the Officer who tasered Mario as having a buzz

cut hair cut as well as a white uniform shirt.  Both of the witnesses who were in the room while the incident transpired testified that the entire incident was captured on Mr. Osagie's cell phone, but that the cell phone was later taken from Ms. Lloyd by an NYPD Detective, which to date has not been returned.

122.  All eye witnesses verified that NYPD officers viciously beat Mario, and then shocked him with a Taser device until he stopped moving and speaking. They also verified that when EMS came, Mario was not conscious, but that they did not provide CPR or resuscitative measures until he was moved out of his home.

123.  On June 12th, 2015 the family of Mario including Ms. Pagan, Mr. Osagie and a reporter from DNA Info, went to the 52nd Precinct in an attempt to find out what happened to the cell phone which NYPD confiscated.  At the Precinct they met with Detective Mazzella in a large room in the back.  After sitting Dt. Mazzella said to Mr. Osagie, "we have your phone."

124.  Dt. Mazzella said, "Yeah, we took it" and that it was with NYPD Computer Crimes. Dt. Mazzella then explained that there was a Search Warrant for the phone. He then left the room.

125.  After a brief break, suddenly and without explanation, Detective Mazzella ejected the entire family, Mr. Osagie, and the reporter from the station.

126.  After being ejected from the precinct Mr. Osagie protested that he needed to make a criminal complaint regarding the incident.  He then asked for the desk officer. However, two different sergeants, Sgt. Deleon and Sgt. Cavallaro, informed him that he could not make a criminal complaint for theft of property.

127.  On June 17th, 2015, the family met with the Bronx District Attorney's office to request answers regarding the case.  Bureau Chief Edward Talty and Assistant District Attorney James Brennan offered little information and explained that there were no details on any prosecutions in the near future.

128.  The Bronx District Attorney's office did state that there was a warrant for the phone which one of the eye witnesses used to record the entire incident. However, Mr. Osagie to date has never received a copy of the warrant despite repeated requests for same through counsel.

129.  The Office of the Chief Medical Examiner conducted a medical examination and determined that Mario died as a result of cardiac arrest.

130.  Upon information and belief, the NYPD has confiscated the cell phone, and

it remains unknown if it destroyed any video imagery contained therein in order to protect officers who used excessive and unnecessary force in subduing Mario.

131.     According to the eye witness statements on record with the CCRB, the video shows between 5 and 10 officers brutally beating Mario as he lay on the ground. It shows that Mario was an older man (51 years old) and more than 7 men were not required to subdue him. The video also shows officer's macing Mario's face, and using their batons to beat him before and after he was restrained. Most of all the video shows an officer in a white shirt walk into the apartment with a Taser in hand, and shoot Mario in the back, shocking him until he stopped moving.

I. The Attempted Cover-Up of the NYPD Officers' Role in Mario's Death

132.     A conspiracy by the EMT and NYPD Defendants to cover up the true circumstances of Mario's death began immediately after the Defendants on the scene realized he was seriously injured, and continued thereafter.

133.     Upon information and belief, one or more EMT and/or NYPD Defendants directed that Mario be removed from his home and transported to the hospital in this secretive manner for the purpose of concealing from his family the fact that he had been killed in their custody in Mario's home.

134.     Ms. Lloyd called Mario's family and informed them of his body's location.

135.     The family went to the Allen Hospital and viewed Mario's dead body. According to images of Mario's body taken by his oldest niece, Belinda Cruz, Mario left the incident with deep tissue wounds about his face, chest, arms, legs, ribs and back as well as the two metal prongs of the Taser prongs still lodged in his back.

136.     Mario's family was neither officially notified of his death nor given any information regarding the incident to date.

137.     NYPD Officials did however immediately release reports that Mario was shocked with a Taser because he was purportedly wielding scissors and on heroin.

138.     Immediately after Mario's death, a conspiracy to cover up the killing began. The EMS and NYPD officers agreed upon a false account of Mario's death.  Mario was falsely accused of being the aggressor against the police, and was falsely claimed to have been wielding a pair of scissors. They alleged he died only after leaving NYPD custody.  Upon information and belief, this false account was spread by the NYPD to other city agencies and to the press in an attempt to blame and stigmatize the victim.

139.     The Deputy Commissioner for Public Information (DCPI), the branch of the NYPD responsible of public relations, immediately released to the public information regarding Mario's distant past, stating that he was an ex-con, and that he was wielding scissors at officers while he was high on heroin which forced officers to use their Taser so that he would drop them.

140.     Within hours that same day, The Wall Street Journal released an article stating:

> *"A scissors-wielding man in the Bronx died in New York Police Department custody Monday morning after police used a Taser to subdue him and emergency personnel gave him anti-heroin medications, a law-enforcement official said."*

141.     Reports also came out regarding Mario's past infractions with the law, and a baseless unsubstantial history of substance abuse.

142.     Recently, however, the NYPD has changed its story.  According to the New York Times, a confidential NYPD Official validated that Mario did not have any scissors in his hand.  Additionally, all of the eye witnesses and family members verified that Mario was not on heroin (a depressant), nor did he have a known history of heroin use. *See* J. David Goodman, "Family Disputes Police Account of Bronx Man's Stun Gun Death," New York Times (June 10th, 2015).

143.     Also the medical examiners autopsy has revealed that no heroin was present in Mario's blood during the incident.

J. NYPD's Culture, Custom and Practice of Disregard for Persons with Mental Illness

144.     NYPD's culture of disregard for emotionally disturbed persons is manifest in Commissioner Bratton's repeated failures to effectively train and supervise NYPD officers for interactions with persons with mental illness.

145.     Numerous persons with mental illness, in addition to Mario, have died as a result of these failures, including:

a.   On October 2, 2012, police responded to an ambulance call placed by the mother of Mohamed Bah.  Bah's mother sought psychiatric attention for his son because he would not leave his apartment and was depressed.  Police provoked a confrontation with Bah and then tasered, shot and killed him.

b.   On October 3, 2010, police shot and killed Emmanuel Paulino, a man diagnosed with mental illness, in the Inwood section of Manhattan.

17

According to eyewitnesses, Paulino was walking in circles and speaking to himself when police shot him 18 times from a distance of thirty (30) feet.

c.  In 2008, NYPD officers responded to a call from the mother of thirty-five (35) year-old Iman Morales, who wasn't answering his front door.

When police arrived at the Bedford-Stuyvesant apartment, Morales, naked, retreated out the window and onto a ledge 10 feet above the sidewalk. Police called for an inflatable air bag to place before shooting him with a Taser. Morales went stiff, fell headfirst from the ledge onto the sidewalk, and died.

d.  On November 12, 2007, NYPD officers shot and killed Khiel Coppin, an eighteen (18) year-old with a psychiatric history.  Coppin's mother told police that he was unarmed, but police shot him believing that a hairbrush he held under his shirt was a gun.

e.  On November 18, 2007, NYPD officers shot and killed David Kostovski, a twenty-nine (29) year-old with a psychiatric history. Kostovski brandished a broken bottle at police when they cornered him, to which police responded with a hail of gunfire.

f.  In February, 2006, Stephanie Lindboe, a sixty-five(65)  year old woman believed to have been emotionally disturbed, was shot twice by a police officer in his apartment building.

g.  On August 30, 1999, NYPD officers shot and killed Gideon Busch, a thirty-one (31) year-old with a psychiatric history.  Busch, an observant Jew, was in his apartment when six police officers confronted him and attempted to subdue him with pepper spray.  Busch became upset, striking out with a small hammer intended for ritual religious use. Four officers fired on Busch, killing him.

146.     Upon information and belief, the Supervisory Officer Defendants were aware, or in the exercise of reasonable diligence should have been aware, of reports and complaints against one or more of the Police Officer Defendants with respect to the use of excessive force and/or mistreatment of emotionally disturbed persons prior to June 8th, 2015, but failed to take reasonable disciplinary or other corrective action to prevent misconduct.  That failure to take corrective action constitutes deliberate indifference that caused the assault, mistreatment and death of Mario.

147.     Upon information and belief, the City, Commissioner Bratton and the Supervisory Officer Defendants were or should have been aware of the past unlawful, reckless, and wanton treatment received by persons with mental illness from the Police Officer Defendants and

other NYPD police officers, yet failed to adequately supervise or train with respect to such treatment, including but not limited to the need for patience, the requirement that a supervisory officer be present, the need to involve family members as appropriate in the encounter, and the safe and proper use of equipment and restraint techniques.  That persistent and widespread failure to adequately supervise and train NYPD personnel constitutes deliberate indifference that caused the assault, mistreatment and death of Mario.

148.      The failures of the Supervisory Officer Defendants, Commissioner Bratton and the City permitted the Police Officer Defendants to be in a position to unlawfully assault and kill Mario, to cover it up and to otherwise violate him state and constitutional rights.

149.      As a result of the foregoing, plaintiff has been deprived of the love, affection and support of her family member and has suffered a grave loss to their family relationship.

## COUNT ONE – VIOLATION of 42 U.S.C. § 1983
## (AGAINST ALL DEFENDANTS)

150.      Plaintiff realleges each allegation contained in the preceding paragraphs as if set forth separately herein.

151.      By reason of the foregoing, defendants, acting under color of state law, violated 42 U.S.C. Section 1983 by depriving Mario of his rights under the Fourth and Fourteenth Amendments to the United States Constitution, including without limitation the rights to be free from (*a*) the intentional use of unreasonable force; (*b*) unnecessary and wanton infliction of pain; (*c*) the prevention and denial of critical medical attention; and (*d*) the deprivation of life and liberty without due process of law.

152.      As a direct and proximate result of said violations, Mario and plaintiff suffered the injuries and damages in an amount to be determined at trial.

## COUNT TWO – VIOLATION of 42 U.S.C. § 1983
## (SUPERVISORY LIABILITY/FAILURE TO TRAIN)
## (AGAINST COMMISSIONER BRATTON AND THE SUPERVISORY OFFICER
## DEFENDANTS)

153.      Plaintiff realleges each allegation contained in the preceding paragraphs as if set forth separately herein.

154.      By reason of the foregoing, Commissioner Bratton and the NYPD supervisory personnel, acted with reckless disregard and deliberate indifference in the supervision of the NYPD Defendants, thereby causing the assault, injury and death of Mario in violation of 42

U.S.C. Section 1983, and the violation of other rights secured by the United States Constitution.

155.     As a direct and proximate result of said violations, Mario and plaintiffs suffered the injuries and damages described above in an amount to be determined at trial.

### COUNT THREE – VIOLATION of 42 U.S.C. § 1983
### (*MONELL* LIABILITY)
### (AGAINST THE CITY)

156.     Plaintiff realleges each allegation contained in the preceding paragraphs as if set forth separately herein.

157.     Through, without limitations, Mayor de Blasio, Commissioner Bratton and, Commissioner Nigro, the City of New York has developed and maintained customs, policies and practices exhibiting deliberate indifference to the constitutional rights of its citizens, which caused the violations of Mario's rights.

158.     It has been the policy and/or custom or practice of the City to inadequately and improperly investigate complaints of physical abuse by NYPD police officers.

159.     Instead, acts of brutality against citizens have been swept under the rug by the City, its employees and agents, who substantially failed to appropriately investigate, deliberate, and discipline NYPD personnel who engaged in such conduct.

160.     It has been a custom, policy, and/or practice of the City to conduct inadequate screening in the hiring and retention of police officers for their propensity for violence and bias against, and insensitivity toward persons in emotional crisis and/or with mental illness.

161.     It was a custom, policy, and/or practice of the City to fail to adequately train, supervise and discipline police officers such that the public and particularly persons in emotional crisis would not be placed in unreasonable risk of being the victims of violent behavior by the police.

162.     As a direct and proximate result of the foregoing acts, omissions, systemic deficiencies and the City's deliberate indifference, Mario's constitutional rights were violated, resulting in injuries and damages in an amount to be determined at trial.

### COUNT FOUR – SURVIVAL CLAIM FOR ASSAULT AND BATTERY UNDER NEW YORK
### EPTL § 11-3.2(b)
### (AGAINST ALL DEFENDANTS)

163.     Plaintiff realleges each allegation contained in the preceding paragraphs as if set forth separately herein.

164.     By reason of the foregoing, defendants intentionally placed Mario in apprehension of imminent harmful contact and without his consent, intentionally caused offensive and harmful bodily contact to Mario, including without limitation by pursuing him, grabbing him by the arms, tackling him, placing their weight upon him, pulling his hands behind his back while he lay face down, beating him, applying electric current to him, and/or asphyxiating him.

165.     As a result of the foregoing Mario suffered grievous bodily harm, substantial physical and emotional pain and loss of life.

166.     As a consequence, Mario and plaintiff suffered damages, including funeral and memorial service expenses, in an amount to be determined at trial.

### COUNT FIVE – SURVIVAL CLAIM FOR NEGLIGENCE AND GROSS NEGLIGENCE UNDER NEW YORK EPTL § 11-3.2(b) (AGAINST ALL DEFENDANTS)

167.     Plaintiff realleges each allegation contained in the preceding paragraphs as if set forth separately herein.

168.     Defendants owed a duty of reasonable care in their interactions with Mario to avoid causing him unnecessary injury or harm, including without limitation through the use of excessive force.

169.     Defendants, while holding Mario in their custody, prevented him from obtaining timely medical care from the members of his family or from the EMTs who were in him home, aggravating him injuries, prolonging him pain and suffering, and causing him injuries to worsen and lead to death.

170.     Defendants knew or should have known that antagonizing, challenging, chasing, restraining, leaning their weight upon, beating, denying medical care and applying electric current to Mario would result in causing him severe emotional distress and physical injury, pain and suffering.

171.     The acts of defendants on June 8th, 2015, including without limitation their antagonizing, challenging, chasing, restraining, leaning their weight upon, beating, denying medical care and applying electric current to Mario, caused him severe emotional distress and physical injury, pain and suffering.

172.     The acts of defendants on June 8th, 2105, including without limitation their antagonizing, challenging, chasing, restraining, leaning their weight upon, beating, denying medical

care and applying electric current to Mario, constituted negligence, gross negligence, recklessness, and/or willful and wanton conduct.

173.    As a result of the foregoing Mario suffered grievous bodily harm, substantial physical and emotional pain and loss of life.

174.    As a consequence, Mario and plaintiffs suffered damages, including funeral and memorial service expenses, in an amount to be determined at trial.

### COUNT SIX – SURVIVAL CLAIM FOR NEGLIGENCE AND GROSS NEGLIGENCE UNDER NEW YORK EPTL § 11-3.2(b) (AGAINST ALL DEFENDANTS)

175.    Plaintiff realleges each allegation contained in the preceding paragraphs as if set forth separately herein.

176.    Defendants owed a duty of reasonable care in their interactions with Mario to avoid causing him unnecessary injury or harm, including without limitation through the use of excessive force.

177.    Defendants, while holding Mario in their custody, prevented him from obtaining timely medical care from the members of him family or from the EMTs who were in him home, aggravating him injuries, prolonging him pain and suffering, and causing him injuries to worsen and lead to death.

178.    Defendants knew or should have known that antagonizing, challenging, chasing, restraining, leaning their weight upon, beating, denying medical care and applying electric current to Mario would result in causing him severe emotional distress and physical injury, pain and suffering.

179.    The acts of defendants on June 8th, 2015, including without limitation their delay in the delivery of appropriate emergency medical care, as well as their injection of the chemical, caused Mario severe emotional distress and physical injury, pain and suffering.

180.    The acts of defendants on June 8th, 2105, including without limitation their slow, inappropriate and detrimental delivery of medical care constituted negligence, gross negligence, recklessness, and/or willful and wanton conduct.

181.    As a result of the foregoing Mario suffered grievous bodily harm, substantial physical and emotional pain and loss of life.

182.     As a consequence, Mario and plaintiff suffered damages, including funeral and memorial service expenses, in an amount to be determined at trial.

## COUNT SEVEN – SURVIVAL CLAIM FOR FAILURE TO TRAIN AND SUPERVISE UNDER NEW YORK EPTL § 11-3.2(b) (AGAINST THE SUPERVISORY OFFICER DEFENDANTS)

183.     Plaintiff realleges each allegation contained in the preceding paragraphs as if set forth separately herein.

184.     The participation by police officers in ambulance calls involving persons with mental illness is a delicate task requiring specialized knowledge and training.

185.     Defendants have a duty to ensure that NYPD personnel responding to ambulance calls have the requisite specialized knowledge and training, do not violate their duties, and that they follow applicable rules, regulations and guidelines.

186.     The foregoing acts and omissions of defendants, including without limitation the failure to provide minimally adequate supervision and training to the Police Officer Defendants, caused Mario severe emotional distress and physical injury, pain and suffering, and loss of life.

187.     As a consequence, Mario and plaintiff suffered damages, including funeral and memorial service expenses, in an amount to be determined at trial.

## COUNT EIGHT – WRONGFUL DEATH UNDER NEW YORK EPTL § 5-4.1(1) (AGAINST THE CITY, THE NYPD AND MEDICAL TECHNICIAN DEFENDANTS)

188.     Plaintiff realleges each allegation contained in the preceding paragraphs as if set forth separately herein.

189.     Due to the foregoing acts and omissions, and as a result of the City's and the NYPD Defendants' negligence, gross negligence, recklessness, and/or willful and wanton conduct, Mario sustained injuries causing him death, depriving plaintiff of his financial contributions, society and guidance, and an expected inheritance from the decedent, as well as other pecuniary losses, in an amount to be proven at trial.

## COUNT NINE – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (AGAINST THE NYPD AND MEDICAL TECHNICIAN DEFENDANTS)

190.     Plaintiff realleges each allegation contained in the preceding paragraphs as if set forth separately herein.

191.     Several of the NYPD Defendants made false statements and deliberately

misled Ms. Pagan into believing that Mario was killed for committing a violent act toward police officers, when in fact those defendants knew he died as a result of officer misconduct.

192.    Ms. Pagan and other family members made repeated attempts to gain information regarding the incident that Mario was involved in, each of which was deliberately thwarted by one or more of the NYPD Defendants.

193.    While denying information, NYPD simultaneously released false reports regarding the incident which were then published in major New York publications.

194.    These reports noted that Mario had a knife, that he was addicted to heroin, and that he had a long history of criminal behavior.

195.    Keeping plaintiffs ignorant of the facts of Mario's death, defendants negligently inflicted severe emotional distress upon Ms. Adela Pagan, as a result of which she suffered, and continues to suffer losses, in amounts to be determined at trial.

## COUNT TEN –INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (AGAINST THE NYPD AND MEDICAL TECHNICIAN DEFENDANTS)

196.    Plaintiff realleges each allegation contained in the preceding paragraphs as if set forth separately herein.

197.    The foregoing acts and omissions of the NYPD Defendants, undertaken recklessly, with deliberate indifference, wantonly and willfully and maliciously, constitute extreme and outrageous conduct beyond the bounds of civilized behavior, which shocks the conscience.

198.    The foregoing acts and omissions of the NYPD Defendants have caused plaintiff severe emotional distress and mental anguish, as a result of which she has suffered damages and losses, in amounts to be determined at trial.

## COUNT ELEVEN – RESPONDEAT SUPERIOR (AGAINST THE CITY)

199.    Plaintiff realleges each allegation contained in the preceding paragraphs as if set forth separately herein.

200.    The acts and omissions of the NYPD Defendants described above were committed in the course and within the scope of their employment by the City.

201.    As the employer of the NYPD Defendants, the City is vicariously liable for the damage and losses caused to plaintiff in amounts to be determined at trial.

WHEREFORE, Plaintiff demands judgment against Defendants, for compensatory and/or punitive damages, jointly and severally, in an amount to be determined at trial, and against defendants, jointly and severally, and for reasonable attorney's fees, costs and disbursements.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all actions triable to a jury.

Date: February 17th, 2016                    Respectfully Submitted:

ISRAEL A. BURNS, ESQ.
BURNS CONSULTING INC.
19 Bay 8th Street
Brooklyn, NY 11228
Tel: (347) 709-2491| Fax: (718) 744-2782
Email: israel@burnsconsulting.us

BRETT H. KLEIN, ESQ., PLLC
305 Broadway, Suite 600
New York, New York 10007
Tel: (212) 335-0132 | Fax: (212) 335-0571
Email: bklein@kleincivilrights.com

*Attorneys for Plaintiff*