UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

ADELA PAGAN, in her own right and as
Administrator of the ESTATE OF MARIO OCASIO,
deceased,

                      Plaintiff,

       v.

THE CITY OF NEW YORK; Lieutenant LUIS
HERNANDEZ, Shield # 04144; Sergeant WAIMING
PUN, Shield # 13083; Officer PAUL CHO, Shield #
04631; Officer PATRICK COYLE, Shield # 24934;
Officer YULITZA BALBI, Shield # 11013; Officer
HIRAM MONTALVO, Shield # 28679, each sued
individually,

                      Defendants.

**MEMORANDUM
AND ORDER**

15-CV-05825 (LDH) (RLM)

LASHANN DEARCY HALL, United States District Judge:

      Plaintiff Adela Pagan, on behalf of herself and as administrator of the estate of Mario

Ocasio, brings this action against Defendants City of New York, Sergeant Waiming Pun, Officer

Paul Cho, Officer Patrick Coyle, Officer Yulitza Balbi, and Officer Hiram Montalvo.[1]  Plaintiff

asserts claims pursuant to 42 U.S.C. § 1983 for excessive force; denial of medical care;

deprivation of life and liberty without due process of law; and supervisory and *Monell* liability

for failure to train, supervise, or discipline officers.  Plaintiff also asserts claims under New York

law for assault and battery, negligence and gross negligence, failure to train and supervise

officers, wrongful death, negligent infliction of emotional distress ("NIED"), intentional

infliction of emotional distress ("IIED"), and respondeat superior.  Defendants move, pursuant to

Rule 56 of the Federal Rules of Civil Procedure, for summary judgment dismissing all of

---

[1] Plaintiff's claims against Lieutenant Luis Hernandez were dismissed with prejudice on June 7, 2018.  (ECF No.
108.)

Plaintiff's claims except those for assault and battery, excessive force, and respondeat superior, to the extent that those claims are based on injuries to Ocasio other than death.

## BACKGROUND[2]

On the morning of June 8, 2015, Mario Ocasio was at home with his girlfriend Geneice Lloyd, her nephew Kashif Osagie, and Osagie's eight-month-old child. (Defs.' Am. Reply Statement Facts Pursuant Local Civ. R. 56.1 ("Defs.' 56.1 Reply") ¶ 1, ECF No. 106-1.) Osagie observed Ocasio in the living room rolling up a cigarette and holding a pair of "little baby scissors." (*Id.* ¶ 4.) Osagie and Lloyd smelled "something funny" that did not smell like marijuana. (*Id.* ¶¶ 5, 8.) When Lloyd asked Ocasio if he was okay, Ocasio yelled various iterations of the phrases "I am God" and "I see God." (*Id.* ¶¶ 6–7, 10.) Ocasio began to break furniture and jump around. (*Id.* ¶¶ 9–10.) This incoherent behavior was unusual for Ocasio. (*Id.* ¶¶ 11–13.) Lloyd suspected that Ocasio might have accidentally ingested K2, a synthetic marijuana. (*Id.* ¶ 14.) Lloyd and Osagie retreated to the bedroom with the child, closing and locking the door behind them. (*Id.* ¶ 15.)

At 8:13 a.m., Lloyd called 911 and informed the operator that Ocasio was "acting crazy," she could not control him, and he needed to be tied down. (*Id.* ¶ 17.) Lloyd also told the operator that Ocasio had a weapon—a pair of scissors—and that Lloyd feared for her safety. (*Id.* ¶ 18.) According to her deposition testimony, Lloyd did not attempt to restrain Ocasio because, although she thought that "eventually [the K2] would have wore [*sic*] off, . . . why take the chance?" (Decl. Barak P. Cardenas Opp. Defs.' Pre-Mot. Letter Summ. J. ("Cardenas Decl.") Ex. I ("Lloyd Dep.") at 105, ECF No. 99-11.) Lloyd told the 911 operator that Ocasio "could

---

[2] The following facts are taken from the parties' statements of material fact pursuant to Local Rule 56.1 and annexed exhibits. Unless otherwise noted, the facts are undisputed.

hurt hisself [*sic*] in the state that he was in" and that Ocasio was in fact "trying to hurt [Lloyd] and himself." (*Id.* at 104, 105.) Plaintiff maintains that Lloyd made these statements for the purpose of getting an ambulance to the scene more quickly. (Defs.' 56.1 Reply ¶ 18.) Lloyd then asked the building superintendent to open the door for the police and ambulance workers so that Ocasio would not get "riled up." (*Id.* ¶ 21.) The superintendent made a separate call to 911 to report that Ocasio was disturbed and required assistance. (*Id.* ¶ 22.)

Having received information that a violent and emotionally disturbed person was carrying scissors, Defendant officers Cho and Coyle responded to the apartment. (*Id.* ¶¶ 23–24.) Lloyd informed Cho that Ocasio had taken "something bad." (*Id.* ¶ 28.) Although the parties agree that Ocasio was lying on the floor when officers arrived, his conduct is in sharp dispute. (*Id.* ¶ 25.) Defendants claim that he was "banging his feet and hands, flailing his arms, speaking incoherently, and talking about God, saying 'I am God.'" (*Id.*) Plaintiff maintains that Ocasio was calmly scratching his stomach. (*Id.*) It is undisputed, however, that officers did not observe Ocasio holding scissors or any other weapon, although scissors were later observed on the floor. (*Id.* ¶ 77.) It is also undisputed that for at least a minute and a half, Cho and Coyle asked Ocasio whether or not he was okay, and Ocasio did not respond to them. (*Id.* ¶ 29.) The officers directed Ocasio to put his hands behind his back, but he did not do so. (*Id.* ¶ 30.) According to Lloyd's deposition testimony, Ocasio instead continued to say, "I'm God. I'm God." (Lloyd Dep. 34.)

Two additional officers, Defendants Balbi and Montalvo, arrived on the scene. (Defs.' 56.1 Reply ¶ 36.) At least two officers attempted unsuccessfully to restrain Ocasio's legs to the ground. (*Id.* ¶ 37.) While officers attempted to handcuff Ocasio, he kept his arms tucked close to his body and continued to say, "I'm God. I'm God." (*Id.* ¶ 38.) According to Lloyd's

3

deposition testimony, one officer then began hitting Ocasio with his or her baton while the other officers attempted to pull Ocasio's arms out.  (Lloyd Dep. 38.)

Defendant Sergeant Pun and another officer then arrived on the scene.  (Defs.' 56.1 Reply ¶ 39.)  Pun's subsequent actions are in dispute.  Defendants assert that Pun struggled with Ocasio for more than a minute, trying unsuccessfully to restrain him, then tasered him before he was handcuffed.  (*Id.* ¶¶ 40–43.)  Plaintiff maintains that Pun tasered Ocasio, who was already handcuffed, immediately and without attempting to restrain him.  (*Id.*)

An emergency medical services ("EMS") team arrived on the scene at 8:30 a.m. and first made contact with Ocasio at 8:34 a.m.  (*Id.* ¶¶ 19, 45.)  According to EMS records, Ocasio was "alert but disoriented."  (*Id.* ¶ 49.)  A team of paramedics then arrived.  (*Id.* ¶ 50.)  The parties agree that Ocasio was already handcuffed at this point and, according to the deposition testimony of Emergency Medical Technician Bree Brown-Rosa, was squirming around and shouting that he was God.[3]  (*Id.* ¶ 52.)  At approximately 8:40 a.m., a paramedic administered a sedative to facilitate Ocasio's removal from the apartment.  (*Id.* ¶ 56.)  Inside the ambulance at approximately 8:47 a.m., Ocasio went into cardiac arrest.  (*Id.* ¶ 63.)  Paramedics took responsive actions, including intubation and defibrillation, but Ocasio's heart was beating irregularly and too quickly to sustain life.  (*Id.* ¶¶ 64–67.)  Ocasio was pronounced dead at 9:50 a.m.  (*Id.* at ¶ 68.)

The autopsy report states that the cause of death was "cardiac arrhythmia during excited delirium due to acute intoxication by synthetic cannabinoid."  (*Id.* ¶ 70.)  The report identifies

---

[3] Although Plaintiff purports to dispute Ocasio's conduct when paramedics arrived, Plaintiff does not support her statement of fact with admissible evidence, as required by Local Rule 56.1.  Specifically, Plaintiff cites to pages 51 through 54 of Lloyd's deposition transcript.  (Defs.' 56.1 Reply ¶ 52.)  However, Plaintiff has not provided the Court with those cited pages.  (*See generally* ECF No. 99-11.)  Thus, Defendants' statement is deemed to be admitted for the purpose of this motion.  *See* E.D.N.Y. Local R. 56.1(c), (d).

contributory factors as "hypertensive cardiovascular disease" and "chronic substance abuse." (*Id.* ¶ 71.)

## STANDARD OF REVIEW

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the [movants are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movants bear the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004). Where the non-movant bears the burden of proof at trial, the movants' initial burden at summary judgment can be met by pointing to a lack of evidence supporting the non-movant's claim. *Celotex Corp.*, 477 U.S. at 325. Once the movants meet their initial burden, the non-movant may defeat summary judgment only by producing evidence of specific facts that raise a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250; *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002). The Court is to believe the evidence of the non-movant and draw all justifiable inferences in her favor, *Anderson*, 477 U.S. at 255, but the non-movant must still do more than merely assert conclusions that are unsupported by arguments or facts, *Bellsouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996).

## DISCUSSION

### I.     Claims Arising out of Ocasio's Death

"In all § 1983 cases, the plaintiff must prove that the defendant's action was a proximate cause of the plaintiff's injury." *Poventud v. City of New York*, 750 F.3d 121, 159 (2d Cir. 2014) (internal alterations omitted). "The proximate cause inquiry focuses on 'whether a cause is a substantial factor in bringing about the harm, or whether the cause is too remotely or

insignificantly related to the harm to be a legal basis for liability.'" *Id.* (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 278–79 (2d Cir. 2003)).  Causation is also an essential element of a wrongful-death claim under New York law, and New York courts similarly apply a substantial-factor standard to such claims. *Jaquez v. Flores*, No. 10-CV-2881, 2016 WL 1267780, at *2 (S.D.N.Y. Mar. 30, 2016).

In this case, all of Plaintiff's claims are predicated, at least in part, on a claim that Ocasio's death resulted from Defendants' conduct.  Specifically, Plaintiff's claims under Count One, for deprivation of life without due process of law, and Count Eight, for wrongful death, both require such a causal link, as described in detail below.  Moreover, the remaining claims all include damages relating to Ocasio's death.  Defendants argue that Plaintiff has adduced no evidence to establish that Defendants' conduct proximately caused Ocasio's death.  (Mem. Law Supp. Defs.' Mot. Partial Summ. J. Pursuant R. 56 Fed. R. Civ. P. ("Defs.' Mem.") 8, ECF No. 113-1.)  Defendants are correct.

During the May 25, 2018 pre-motion conference, Plaintiff conceded that her only direct evidence connecting Defendants' actions to Ocasio's death was the unsworn report of Ibrahim Fatiha, one of Plaintiff's two proffered experts.  (Pre-Mot. Conf. Tr. 14.[4])  Plaintiff acknowledges that the Court has already declined to qualify Mr. Fatiha as an expert.[5]  (Mem. Law Opp. Defs.' Mot. Summ. J. ("Pl.'s Opp.") 9 n.3, ECF No. 116.)  Mr. Fatiha's report is discussed here in order to demonstrate the dearth of evidence supporting Plaintiff's arguments.

---

[4] As of the date of this memorandum and order, a transcript of the pre-motion conference has not been filed on the docket.  The transcript is on file with the court reporter.

[5] At the pre-motion conference, the Court denied Plaintiff's motion to reopen expert discovery to replace Mr. Fatiha's inadmissible report. (Tr. 25.)  Nonetheless, in connection with her opposition brief, Plaintiff filed a two-page affidavit from Dr. Michael M. Baden, M.D., as a purported "replacement report" to that of Mr. Fatiha.  (ECF No. 116-20.)  The Court shall not admit Dr. Baden's untimely report and does not consider it here.

On his resume, Mr. Fatiha summarizes his qualifications as "developing curriculum/lessons and then teaching on various health topics:  infection control, JCAHO guidelines, medical surgical, and critical care"; having an "exceptional academic record and credentials," including certifications as a minimum-data-set coordinator and a critical-care nurse; and volunteering his nursing services for charitable organizations.  (Cardenas Decl., Ex. B ("Fatiha Report") at 2, ECF No. 99-4.)  Since November 2006, Mr. Fatiha has worked as a triage nurse and assistant administrator at two different medical centers, where he has been responsible for, among other things, "recruiting and training staff"; "implementing JCAHO guidelines to improve patient care"; "drastically reducing number [*sic*] of nursing home violations"; "basic bedside care, monitoring patients and reporting adverse reactions"; "[a]dminister[ing] Tuberculin test [*sic*] periodically as requested"; "scrutinizing assessment data and reviewing medical charts, which maximized reimbursement"; "[e]ducat[ing] patients and family [*sic*] regarding diseases"; and "transmitting [medical] information to attending physician.  (*Id.* at 2–3.)  From 2002 to 2006, Mr. Fatiha was a chiropractor "responsible for examining, diagnosing, and treating patients using various adjustive techniques, therapeutic modalities, rehabilitative exercises, and patient education."  (*Id.* at 3–4.)  From February 2002 to March 2003, Mr. Fatiha was an independent medical examiner "responsible for evaluating disability status because of vehicle accidents and work related injuries."  (*Id.* at 3.)  In that role, he would "[d]etermine the need to pursue medical treatment, surgery, or household help."  (*Id.*)  Conspicuously absent from Mr. Fatiha's resume are any skills or professional experience that would qualify him to opine on the effects of drugs on the human body or determine an individual's cause of death.

Compounding Mr. Fatiha's utter lack of relevant qualifications is the fact that his one-page, six-paragraph report—a generous name for what is essentially a sloppy cut-and-paste

job—is conclusory and unsupported by any scientific methodology whatsoever.  The report

opens as follows (without any grammatical or other alterations by the Court):

> It is absolutely no doubt that K2 could ever be a contributing factor to the victim's
> death due to not only the fact that there is no history or finding of Renal failure or
> signs and symptoms of cardiac issues at the time of consumption…. he only
> exhibited some type of misbehavior which could be resolved within a half hour
> more or less…. K2 affects the central nervous system (CNS) which evidently led
> to abnormal behavior such as hallucination (mild) and without any aggression….
> it has absolutely no effect on the cardiovascular system…. it is only could have an
> effect on the cardiovascular system if he would've had kidney failure for a long
> time (chronic)….
>
> The Federal government has restricted all physicians from prescribing any CNS
> depressant to anyone who is taking even the lowest dose of benzodiazepines
> because it really slows down the breathing pattern and leads to labored breathing
> (as Ms. Rosa Brown alleged that his breathing slowed down but not his heart rate)
> … that means he had labored breathing and made his heart convert to further
> damage.

(*Id.* at 6.)  Mr. Fatiha cites no authorities in support of any of the above assertions, which he

cobbles together into a barely coherent argument that Ocasio's death could not have been caused

by the effects of the K2 Ocasio had ingested but rather may have been caused by the

administration of a sedative.

Perhaps realizing he has strayed far, far away from his wheelhouse, Mr. Fatiha simply

plagiarizes the remainder of his report—without citation, and without even removing the internal

footnote reference numbers—from a January 2014 article by Douglas P. Zipes, M.D., entitled

*TASER Electronic Control Devices Can Cause Cardiac Arrest in Humans*, available at

https://www.ahajournals.org/doi/pdf/10.1161/CIRCULATIONAHA.113.005504.[6]  Specifically,

the text indicates that a causal relationship between a taser shock and cardiac arrest may be

established where (1) there has been "cardiac capture at rapid rates," (2) the taser shock precedes

---

[6] Curiously, Mr. Fatiha includes an endnote citing an earlier article by Dr. Zipes, entitled *Sudden Cardiac Arrest and Death Following Application of Shocks from a TASER Electronic Control Device*, available at https://www.ahajournals.org/doi/pdf/10.1161/CIRCULATIONAHA.112.097584.

loss of consciousness and cardiac arrest, (3) there is recorded ventricular fibrillation, (4) one or both taser barbs land near the heart, (5) there is no other plausible alternative explanation for the cardiac arrest, and (6) there are similar cases in the literature.  (Fatiha Report 6.)

Even if the Court were to take the unimaginable step of crediting Mr. Fatiha's opinion, it would not defeat summary judgment here.  Mr. Fatiha merely recites certain conditions that, if present, could establish causation.  (*Id.*)  However, these conditions were not all present in this case:  notably, Ocasio received a shock to his back, not near his heart; the effects of the K2 in Ocasio's system present a plausible alternative explanation for his cardiac arrest; and his cardiac arrest occurred well after the taser shock, unlike other cases in the literature.  (Decl. Alan H. Scheiner Supp. Defs.' Mot. Summ. J. ("Scheiner Decl."), Ex. H ("Laskowski Report") at 8, ECF No. 95-10.)  Thus, even the internal logic of Mr. Fatiha's opinion, such that there is any, does not lead to the conclusion that Defendants' actions were a substantial factor in bringing about Ocasio's death.  Indeed, Mr. Fatiha takes no clear position as to causation.  In sum, Mr. Fatiha's lack of expertise in any relevant field and his failure to follow a scientific methodology render his report unhelpful to determining causation and therefore inadmissible as evidence.[7]  *See Glowczenski v. Taser Int'l, Inc.*, 594 F. App'x 723 (2d Cir. 2014) (summary order) (affirming exclusion of expert whose opinion as to cause of death by taser "lacked a sufficiently reliable scientific basis").

---

[7] Plaintiff's counsel's utter failure to retain a qualified expert is particularly egregious in this tragic case, in which a man died following an encounter with police officers.  A competent expert may have been able to establish a triable issue of the cause of Ocasio's death.  *See generally Briscoe v. LaHue*, 460 U.S. 325, 333–34 (1983) ("[T]he truth-finding process is better served if [a] witness's testimony is submitted to 'the crucible of the judicial process so that the factfinder may consider it, after cross-examination, together with the other evidence in the case to determine where the truth lies.'" (quoting *Imbler v. Pachtman*, 424 U.S. 409, 440 (1976) (White, J., concurring)).  However, the Court's role is to rule on the legal issues before it, not to effectively prosecute Plaintiff's case.

Unlike Plaintiff, Defendants have proffered a reasoned, substantiated expert report, by Dr. Larissa Laskowski, D.O., an assistant professor of emergency medicine and medical toxicology at New York University.  (*See generally* Laskowski Report.)  Having reviewed the state autopsy report and other materials, Dr. Laskowski concludes that Ocasio died as a result of the effects of a synthetic cannabinoid that was present in his blood.  (*Id.* at 4.)  Dr. Laskowski notes that the state autopsy report contains no evidence to suggest that Ocasio sustained any lethal traumatic injuries.  (*Id.*)  Dr. Laskowski indicates that, even if it were established that Ocasio had not resisted arrest or was tasered after being handcuffed, she would still conclude that Ocasio's death was proximately caused by the effects of the synthetic cannabinoid.  (*Id.* at 8.)

Curiously, Plaintiff argues that Dr. Laskowsi's report and the state autopsy report on which she relies are inadmissible because they are unsworn and unreliable.  (Pl.'s Opp. 15–17.) Plaintiff fails to acknowledge the irony of her argument, given that Mr. Fatiha's report is also unsworn and is patently unreliable.  Nonetheless, during the pre-motion conference, Plaintiff conceded that she had neither issued a subpoena to the former state medical examiner who prepared the autopsy report nor accepted Defendants' alternative proposal to depose a current state medical examiner who had reviewed the autopsy report.  (Tr. 19–21.)  Plaintiff further conceded that Defendants had not engaged in any discovery violations.  (Tr. 21.)  In any event, the Court need not determine the admissibility of Dr. Laskowski's report, because even if the Court were to exclude it, Plaintiff has failed to carry her burden to adduce evidence in the record supporting causation.

As noted above, Plaintiff conceded during the pre-motion conference that Mr. Fatiha's inadmissible report constituted her sole evidence on causation, apart from the fact that Ocasio

died subsequent to his encounter with Defendant officers.[8]  (Tr. 14.)  Now, Plaintiff argues that, as a matter of law, a jury does not need the aid of expert testimony to determine the proximate cause of Ocasio's death.  (Tr. 22–23.)  Plaintiff has taken an unnuanced view of the law. Although it is true that expert testimony is unnecessary where a lay jury is as capable as an expert of "comprehending the primary facts and of drawing correct conclusions," expert testimony is required where, as here, "the nexus between the injury and the alleged cause would not be obvious to the lay juror." *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004) (quoting *Salem v. United States Lines Co.,* 370 U.S. 31, 35 (1962)).  "In a case such as this, where an injury has multiple potential etiologies, expert testimony is necessary to establish causation . . . ."  *Wills*, 379 F.3d at 46.  A plaintiff's failure to adduce admissible expert testimony as to cause of death is fatal to a wrongful-death claim arising out of defendant police officers' use of a taser.  *Glowczenski v. Taser Int'l, Inc.*, 928 F. Supp. 2d 564, 584–85 (E.D.N.Y. 2013); *see also Glowczenski*, 594 F. App'x 723 (affirming summary judgment in favor of defendant taser manufacturer on wrongful-death and products-liability claims on the ground that the plaintiff had failed to present expert evidence as to cause of death).

Having failed to adduce any admissible expert evidence to establish causation, Plaintiff cannot maintain any claims that arise out of Ocasio's death.  These include the claims under Count One for deprivation of life without due process and Count Eight for wrongful death, as well as all other claims insofar as they seek damages based on Ocasio's death.

---

[8] In her belated opposition brief, Plaintiff suggests that the unsworn report of her second proffered expert, Felipe Rodriguez, may also help establish causation.  (Pl.'s Opp. 8–9.)  It may not.  Mr. Rodriguez is a former New York Police Department sergeant.  (ECF No. 99-3 at 2.)  Even if Mr. Rodriguez had relevant expertise to opine on the cause of Ocasio's death, which he does not, his sole conclusion—that he "can say with a great deal of certainty that [Defendant Pun] deployed the Taser outside of the manufacturers [*sic*] recommended guidelines" (*id.* at 16)—is irrelevant to the issue.

## II.     Other Claims

### A.     False Arrest

#### 1.     Probable Cause

Defendants argue that Plaintiff's state and federal claims for false arrest should be dismissed on the ground that there was probable cause to arrest Ocasio.  (Defs.' Mem. 13–15.) The elements of such claims are "substantially the same" under both New York and federal law. *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).  Probable cause serves as a complete defense to any claim for false arrest.  *Savino v. City of New York*, 331 F.3d 63, 72, 76 (2d Cir. 2003). Probable cause is established when the "arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested."  *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (internal quotation marks and citations omitted).  Moreover, "[p]ursuant to New York's Mental Hygiene law, the police may take into custody individuals who both appear mentally ill and pose a substantial risk of physical harm to others.  Probable cause to make such an arrest means a substantial chance or probability that those requirements are satisfied, based on the information that the police had at the time."  *Heller v. Bedford Cent. Sch. Dist.*, 665 F. App'x 49, 53 (2d Cir. 2016) (summary order) (citations omitted).  "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers or may require a trial if the facts are in dispute."  *Weyant*, 101 F.3d at 852 (citations omitted).  "It is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity."  *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (internal quotation marks, citations, and alteration omitted).

Here, the police received two 911 calls in quick succession from two identified callers—one of them an eyewitness—describing Ocasio as disturbed, uncontrollable, and potentially carrying a weapon.  (Defs.' 56.1 Reply ¶¶ 17, 22.)  Lloyd, the eyewitness, expressly informed the 911 operator that she feared for her safety.  (*Id.* ¶ 18.)  Upon the officers' arrival at the apartment, they observed furniture and other objects strewn about, and Lloyd informed officers that Ocasio had taken "something bad."  (*Id.* ¶¶ 25–26, 28.)  However, the parties dispute whether, when the police arrived, Ocasio was still flailing about or was instead lying calmly on the floor.  (*Id.* ¶ 25.)  Ocasio was detained within 21 minutes after the first 911 call.  (*See id.* ¶¶ 45, 52.)  There can be no question that the information officers received before arriving at the apartment would have established probable cause to arrest Ocasio, had he continued acting as described on the 911 calls.  However, viewing the evidence in the light most favorable to Plaintiff, it is a closer call whether probable cause was subsequently dissipated upon officers' arrival on the scene.  *See Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003) ("We believe that under some circumstances, a police officer's awareness of the facts supporting a defense can eliminate probable cause."); *see also Grice v. McVeigh*, 873 F.3d 162, 176 (2d Cir. 2017) (Parker, J., dissenting) (citing *Jocks* to argue that probable cause dissipated where officers continued detaining the plaintiff even after having "cleared him of any threat").  Nonetheless, the Court need not decide the issue, because Defendants are entitled to qualified immunity, as discussed below.

2.      Qualified Immunity

The question of whether police officers are entitled to qualified immunity from a false-arrest claim "turn[s] on whether the defendant officers' probable cause determination was objectively reasonable—that is, whether there was 'arguable' probable cause to arrest."  *Betts v. Shearman*, 751 F.3d 78, 83 (2d Cir. 2014) (quoting *Jenkins v. City of New York*, 478 F.3d 76, 87

13

(2d Cir. 2007)).  "Arguable probable cause exists 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'"  *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (quoting *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991)).  "Thus, the analytically distinct test for qualified immunity is more favorable to the officers than the one for probable cause; 'arguable probable cause' will suffice to confer qualified immunity for the arrest."  *Escalera*, 361 F.3d at 743.

Here, the police received 911 calls from two identified witnesses describing Ocasio as disturbed and dangerous.  (Defs.' 56.1 Reply ¶¶ 17, 22.)  Defendant officers arrived to find the apartment in disarray.  (*Id.* ¶¶ 25–26.)  Lloyd told Defendant officers that Ocasio had taken "something bad," and, importantly, Lloyd never disavowed her statements to the 911 operator regarding her fear for her and Ocasio's safety.  (*Id.* ¶ 28.)  The time between the first 911 call and Ocasio's arrest was no more than 21 minutes.  (*Id.* ¶¶ 16, 45.)  And paramedics felt the need to sedate Ocasio before removing him from the apartment.  (*Id.* ¶ 56.)  Under such circumstances, Defendant officers could reasonably have concluded that probable cause existed to arrest Ocasio under the Mental Health Law.  That is, based on the information available to them, it was objectively reasonable to believe that—or, at the very least, officers of reasonable competence could have disagreed whether—Ocasio presented a risk to himself or others.  Such a determination would still have been reasonable even if Ocasio was acting calmly at the moment officers entered the apartment, given the information they had previously received.  Thus, Defendants are protected by qualified immunity, and Plaintiff's claim for false arrest must be dismissed.

**B.       Deliberate Indifference to Medical Needs**

Under § 1983, "the official custodian of a pretrial detainee may be found liable for violating [a] detainee's due process rights if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need." *Weyant*, 101 F.3d at 856.  Not every delay in treatment is actionable.  In fact, the Second Circuit has reserved the deliberate-indifference classification for "cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a life-threatening and fast-degenerating condition for three days, or delayed major surgery for over two years."  *Demata v. N.Y. State Corr. Dep't of Health Servs.*, 198 F.3d 233 (2d Cir. 1999) (internal quotation marks and citations omitted).

Here, there is simply no evidence in the record to suggest that Defendants deliberately delayed or interfered with Ocasio's medical care for any reason whatsoever.  In fact, it is undisputed that medical personnel arrived on the scene within 17 minutes after the first 911 call and began evaluating and treating Ocasio within four minutes thereafter.[9]  (Defs.' 56.1 Reply ¶¶ 16, 45, 49, 54.)  Thus, the deliberate-indifference claim under Count One is dismissed.[10]

---

[9] At the pre-motion conference, Plaintiff conceded that there is no evidence in the record to suggest that the medical care Ocasio received was constitutionally deficient.  (Tr. 32–33.)  The Court instructed Plaintiff to proceed "only on the causes of action that are legally viable."  (Tr. 33.)  Nonetheless, Plaintiff continued prosecuting this meritless claim.

[10] Plaintiff also asserts a claim under Count One for "unnecessary and wanton infliction of pain."  (Am. Compl. ¶ 151.)  This language appears to come from the legal standard for establishing cruel and unusual punishment in violation of the Fourth Amendment's Due Process Clause, not the Eight Amendment's Cruel and Unusual Punishments Clause, which applies to prisoners.  *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2475 (2015).  Because Ocasio was not a prisoner, Plaintiff may not assert an Eighth Amendment claim on his behalf.

### C.     Supervisory Liability under § 1983

Plaintiff alleges that Defendant Pun "acted with reckless disregard and deliberate indifference in the supervision of [Defendant officers], thereby causing the assault, injury and death of [Ocasio]."[11]  (Am. Compl. ¶ 154, ECF No. 37.)  As discussed above, Plaintiff cannot pursue claims arising out of Ocasio's death, so the Court construes Count Two as a § 1983 claim for supervisory liability for excessive force resulting in injuries other than death.  Because vicarious liability is inapplicable to § 1983 actions, Plaintiff must establish that Defendant Pun was personally involved in the constitutional violation at issue.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*.").

> Personal involvement of a supervisory defendant may be shown by evidence that: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring."

*Delee v. Hannigan*, 729 F. App'x 25, 30 (2d Cir. 2018) (summary order) (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).

Here, it is undisputed that Defendant Pun participated directly in the use of force against Ocasio—namely, by tasering him.  (Defs.' 56.1 Reply ¶ 42.)  Thus, the § 1983 claim against

---

[11] Plaintiff's claim for supervisory liability is also asserted against Sergeant Luis Hernandez, NYPD Commissioner William Bratton, and six unknow Richard Roes.  (Am. Compl. ¶¶ 153–55.)  However, Sergeant Hernandez was dismissed from this action by stipulation and order dated June 7, 2018.  (ECF No. 108.)  None of the other parties is named as a defendant in the operative second amended complaint.  (ECF No. 37.)  Their inclusion in Count Two appears to be a holdover from the first amended complaint, which did name them.  (ECF No. 31.)

Defendant Pun may proceed to trial despite the apparent lack of evidence under the other four tests for personal involvement set forth in *Delee v. Hannigan*.[12]

### D.      Failure to Train and Supervise

"New York law does not permit of [*sic*] a claim for negligent hiring, screening, retention, supervision, and training where defendants act within the scope of their employment." *Edrei v. City of New York*, 254 F. Supp. 3d 565, 583 (S.D.N.Y. 2017), *aff'd sub nom. Edrei v. Maguire*, 892 F.3d 525 (2d Cir. 2018); *see also Schoolcraft v. City of New York*, 103 F. Supp. 3d 465, 521 (S.D.N.Y. 2015) (collecting cases). Here, Plaintiff concedes that Defendants acted within the scope of their employment. (Am. Compl. ¶ 200.) Accordingly, Count Seven must be dismissed.

### E.      *Monell* Liability under § 1983

Defendant City of New York argues that Plaintiff's *Monell* claim must be dismissed on the grounds that Plaintiff has failed to adduce evidence to support any theory of municipal liability. (Defs.' Mem. 21–23.) The Court agrees. In order to hold a municipal entity liable under § 1983, a plaintiff must prove that he was "deprived of a constitutional right through an official [municipal] policy, practice, or custom." *Stratakos v. Nassau Cty.*, No. 15-CV-7244, 2016 WL 6902143, at *3 (E.D.N.Y. Nov. 23, 2016). A plaintiff can establish an official policy or custom by showing any of the following: "(1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so widespread that it constitutes a custom of which policymakers must have been aware; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised 'deliberate indifference' to the rights of the

---

[12] The Court notes, however, that Plaintiff's § 1983 claim against Defendant Pun for supervisory liability under Count Two appears duplicative of the § 1983 claim for excessive force under Count One. Plaintiff shall not be permitted to recover twice from the same Defendant for the same injury. *Restivo v. Hessemann*, 846 F.3d 547, 593 (2d Cir. 2017).

plaintiff and others encountering those subordinates." *Id.* "[C]onclusory allegations of a municipal custom or practice of tolerating official misconduct are insufficient to demonstrate the existence of such a custom unless supported by factual details." *Id.* at *4.

Here, Plaintiff has adduced no admissible evidence necessary to maintain a claim for *Monell* liability. (*See generally* Defs.' 56.1 Reply ¶¶ 75–88.) Plaintiff's only purported evidence is Lloyd's deposition testimony that it was officers' "normal practice" to taser emotionally disturbed persons.[13] (*Id.* ¶ 85.) However, because Plaintiff never filed the cited pages of Lloyd's deposition transcript, the Court cannot verify whether Lloyd's testimony supports Plaintiff's factual assertion. And even if Lloyd had so testified, Plaintiff does not explain why Lloyd would be competent to testify as to NYPD practices or why her testimony would bind Defendant City of New York. *Cf. Torrel v. City of New York*, 114 F. App'x 14, 16 (2d Cir. 2004) (summary order) (holding that statements made without personal knowledge are excludable under Rule 56(e) on summary-judgment review, as they would be inadmissible under Rule 602 of the Federal Rules of Evidence); *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998) (holding that the actions of an individual below the policy-making level are generally insufficient on their own to show a municipal policy). To be clear, Lloyd is not competent to so testify, and her testimony would not bind the municipality. In addition, Plaintiff's bare, belated assertion that officers who were at the scene were inadequately trained to interact with emotionally disturbed persons is insufficient to create a triable issue of fact.[14] (*See* Pl.'s Opp. 28–29.) Thus, Count Three is dismissed.

---

[13] In her second amended complaint, Plaintiff describes seven instances from 1999 to 2012 in which she alleges that emotionally disturbed persons died as a result of interactions with police. (Am. Compl. ¶ 145.) Plaintiff has adduced no evidence to corroborate these allegations.

[14] Plaintiff's contention that she "was prevented from conducting discovery on the matter [of *Monell* liability] by Court order" (Pl.'s Opp. 29) severely mischaracterizes Chief Magistrate Judge Roanne L. Mann's patient, fair handling of discovery in this case. In October and November 2016, Judge Mann thrice granted Plaintiff's requests

## F.        Negligence

Defendants correctly argue that Counts Five and Six must be dismissed because negligence claims are impermissibly inconsistent with claims for excessive force, which are predicated on intentional conduct.  (Defs.' Mem. 19–20.)  As discussed at the pre-motion conference and stated in the Court's June 4, 2018 order, these claims are ripe for dismissal because "a claim of harm predicated solely on intentional acts may not give rise to a claim of negligence," *Fiedler v. Incandela*, 222 F. Supp. 3d 141, 167 (E.D.N.Y. 2016); *see also Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994) ("Under New York law, a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest or initiating a prosecution."); *Mazurkiewicz v. New York City Transit Auth*., 810 F. Supp. 563, 570–71 (S.D.N.Y. 1993) ("Plaintiff cannot argue that defendants engaged in intentional conduct that forms the basis of an assault and § 1983 excessive force claim and also argue that defendants were negligent towards plaintiff.  Negligence on the part of state officials will not support a § 1983 claim.").  Count Nine, for NIED, must be dismissed on the same grounds.

## G.        IIED

Defendants incorrectly suggest that Count Ten, for IIED, must be dismissed on the grounds that the claim is not asserted against any named Defendants.  (Defs.' Mem. 2 n.2.)  In fact, the claim is asserted not only against the "Medical Technician Defendants," who are not

---

for extensions of time to complete discovery.  On April 12, 2017, after hearing extensive arguments from the parties, Judge Mann concluded that Plaintiff had failed to show good cause why fact discovery should be reopened to permit Plaintiff to depose 16 additional witness, including the mayor, the police commissioner, the Bronx district attorney, and the chief of the NYPD sergeant's union, none of whom was alleged to have any first-hand knowledge related to the claims in this case.  Nonetheless, Judge Mann permitted Plaintiff to depose four other additional fact witnesses on her list and to conduct additional expert discovery.  After further extensions of time, discovery closed on January 10, 2018, more than 26 months after this action was commenced.  In short, Plaintiff had amble, adequate opportunity to conduct *Monell* discovery.

named in the second amended complaint, but also against the "NYPD Defendants," many of whom are.  (Am. Compl. ¶¶ 196–98.)  The complaint expressly defines the NYPD Defendants as Defendants Balbi, Cho, Coyle, Montalvo, and Pun, among other individuals who are not named parties to this action.  (*Id.* ¶¶ 14, 15, 17.)  Nonetheless, Count Ten must be dismissed on other grounds.

"[S]tate courts and federal district courts in this Circuit 'have consistently held that the tort of intentional infliction of emotional distress may not be used as a substitute for an available traditional tort theory.'" *Caravalho v. City of New York*, No. 13-CV-4174, 2016 WL 1274575, at *23 (S.D.N.Y. Mar. 31, 2016) (quoting *Brewton v. City of New York*, 550 F. Supp. 2d 355, 370 (E.D.N.Y. 2008) (other citations omitted)).  That is because where, as here, IIED claims are based on the same conduct as claims for excessive force and assault and battery, "any resulting emotional damage is entirely subsumed by" the latter claims.  *Id.*  Moreover, "under New York law, an intentional infliction tort may be invoked only as a last resort to provide relief in those circumstances where traditional theories of recovery do not."  *Salmon v. Blesser*, 802 F.3d 249, 256 (2d Cir. 2015) (internal quotation marks and citations omitted).  Here, Plaintiff may proceed on her traditional theories of recovery for excessive force and assault and battery, as narrowed by this order.  Count Ten is therefore dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' motion for partial summary judgment is GRANTED in part and DENIED in part.

Plaintiff's claims for deprivation of life without due process of law, wrongful death, false arrest, deliberate indifference to medical needs, failure to train and supervise, *Monell* liability, negligence, gross negligence, NIED, and IIED are dismissed with prejudice.  All of Plaintiff's claims, to the extent they are predicated on Ocasio's death, are also dismissed with prejudice.

Plaintiff's claims for excessive force and supervisory liability under § 1983 and for assault and battery and respondeat superior under New York law shall proceed only as to injuries to Ocasio other than death.

SO ORDERED.

Dated: Brooklyn, New York
      March 28, 2019

s/ LDH
LASHANN DEARCY HALL
United States District Judge